EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Reyes Ramis CPA, Group, P.S.C.<br><br>Recurridos<br><br>v.<br><br>Liza Serra Torres, et al.<br><br>Recurridos<br><br>v.<br><br>Juan Reyes Ramis, et al.<br><br>Peticionarios<br><br>Reyes Ramis CPA, Group, P.S.C.<br><br>Peticionarios<br><br>v.<br><br>Liza Serra Torres, et al.<br><br>Recurridos<br><br>v.<br><br>Juan Reyes Ramis, et al.<br><br>Recurridos | Certiorari<br><br>2016 TSPR 126<br><br>194 DPR ____ |

Número del Caso: CC-2014-744
              Cons. CC-2014-765

Fecha: 17 de junio de 2016

**CC-2014-744**

Tribunal de Apelaciones:

          Región Judicial de Ponce, Panel VIII

 Abogado de la parte Peticionaria:

          Lcdo. Jesús Antonio Rodríguez Urbano

 Abogado de la parte Recurrida:

          Lcdo. René W. Franceschini Pascual

**CC-2014-765**

Tribunal de Apelaciones:

            Región Judicial de Ponce, Panel VIII

Abogado de la parte Peticionaria:

            Lcdo. Carlos Soto Laracuente

Abogado de la parte Recurrida:

            Lcdo. Rene W. Franceschini Pascual

Materia: Sentencia del Tribunal con Opinión de Conformidad.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Reyes Ramis CPA, Group, P.S.C.<br><br>Recurridos<br><br>v.<br><br>Liza Serra Torres, et al.<br><br>Recurridos<br><br>v.<br><br>Juan Reyes Ramis, et al.<br><br>Peticionarios<br>_____<br>Reyes Ramis CPA, Group, P.S.C.<br><br>Peticionarios<br><br>v.<br><br>Liza Serra Torres, et al.<br><br>Recurridos<br><br>v.<br><br>Juan Reyes Ramis, et al.<br><br>Recurridos | CC-2014-744<br><br>Cons.<br><br>CC-2014-765 | Certiorari |

SENTENCIA

San Juan, Puerto Rico, a 17 de junio de 2016.

En el presente caso, concluimos que la cláusula de restricción que contrató la CPA Liza Serra Torres de no atender por un término de 16 meses la clientela que Reyes Ramis CPA Group, P.S.C. posee y desarrolló por su cuenta,

es válida. Por lo tanto, erró el Tribunal de Apelaciones al confirmar la Sentencia Parcial del Tribunal de Primera Instancia que desestimó la causa de acción.

Por las razones antes expuestas, se revoca la Sentencia del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia, Sala Superior de Ponce, para la continuación de los procedimientos en armonía con lo aquí dispuesto.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Kolthoff Caraballo emitió Opinión de Conformidad a la cual se unieron los Jueces Asociados señores Martínez Torres, Rivera García y Feliberti Cintrón. El Juez Asociado señor Estrella Martínez hace constar la siguiente expresión a la cual se unió la Jueza Asociada señora Pabón Charneco:

> "El Juez Asociado señor Estrella Martínez concurre, ya que considera que procede revocar la determinación emitida por el Tribunal de Apelaciones –que confirmó la disposición sumaria del pleito– toda vez que los documentos que obran en autos, en los cuales no se encuentra el Contrato privado para la administración y operación de servicios profesionales, no permiten concluir, sin ambages, si la Sra. Liza Serra Torres era empleada de Reyes Ramis CPA Group, P.S.C. Entiende que es importante precisar este medular hecho para conocer si a la fecha en que se retrotrajo el Acuerdo privado de renuncia voluntaria, redención y compraventa de acciones corporativas, la señora Serra Torres era empleada de la aludida corporación. Esto, para determinar si la cláusula de no competencia aquí en controversia surgió en el contexto laboral. En vista de que lo anterior constituye un hecho material sobre el cual existe controversia real y sustancial, opina que procedía denegar la sentencia sumaria en cuestión. Al amparo de este fundamento, revocaría la Sentencia emitida por el foro apelativo intermedio y devolvería el caso al

tribunal de instancia para la celebración de un juicio en sus méritos".

La Juez Asociada señora Rodríguez Rodríguez disiente sin opinión escrita.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Reyes Ramis CPA, Group, P.S.C.<br><br>Recurridos<br><br>v.<br><br>Liza Serra Torres, et al.<br><br>Recurridos<br><br>v.<br><br>Juan Reyes Ramis, et al.<br><br>Peticionarios<br>_____<br><br>Reyes Ramis CPA, Group, P.S.C.<br><br>Peticionarios<br><br>v.<br><br>Liza Serra Torres, et al.<br><br>Recurridos<br><br>v.<br><br>Juan Reyes Ramis, et al.<br><br>Recurridos | CC-2014-744<br><br>Cons.<br><br>CC-2014-765 | Certiorari |

Opinión de Conformidad emitida por el Juez Asociado señor Kolthoff Caraballo a la cual se unieron los Jueces Asociados señores Martínez Torres, Rivera García y Feliberti Cintrón

En San Juan, Puerto Rico, a 17 de junio de 2016.

En Arthur Young Co. v. Vega III, 136 DPR 157 (1994), este Tribunal abordó la integración de una cláusula de no competencia en un contrato de empleo. Luego, en Martin's BBQ v. García de Gracia, 178 DPR 978 (2010), analizamos el

uso del mencionado tipo de cláusula en los contratos de franquicias. En esta ocasión, concluyo que nos confrontamos con una cláusula de no competencia en el contexto de un contrato de compraventa o redención de acciones de una corporación de servicios profesionales de contadores públicos autorizados. Los hechos pertinentes son los siguientes.

**I**

En septiembre de 2007, los contadores públicos autorizados Juan M. Reyes Ramis (CPA Reyes Ramis) y José A. Colón Álvarez (CPA Colón Álvarez), organizaron la corporación profesional llamada Reyes Ramis CPA Group, PSC. En ésta, el CPA Reyes Ramis poseía el 67% de las acciones y el CPA Colón Álvarez poseía el restante 33%. Diez meses después, en julio de 2008, la contadora pública autorizada Liza Serra Torres (CPA Serra Torres) firmó, junto a estos dos contadores, un documento intitulado "*Contrato Privado para la Administración y Operación de Servicios Profesionales*", mediante el cual adquirió en la corporación una participación y control equivalente a un 12%, a cambio de una aportación de capital de $195 mil pagada en efectivo. En ese momento, la CPA Serra Torres se convirtió también en la Secretaria y Tesorera Auxiliar de la Corporación.[1]

---

[1] Apéndice de la Petición de *certiorari* en caso CC-2014-0744, pág. 138. No surge del expediente de autos en qué proporción se redujo para cada uno la participación del CPA Juan M. Reyes Ramis y el CPA José A. Colón Álvarez, ante la entrada de la CPA Liza Serra Torres (CPA Serra Torres). Como parte de la integración como nueva accionista de la Corporación, la CPA Serra Torres también adquirió 12.81 en acciones comunes de la corporación QSJ Professional Investment, Inc.,

En agosto de 2010, la CPA Serra Torres decidió retirarse de la Corporación. Así, el 1 de noviembre de 2010, suscribió un *"Acuerdo Privado de Renuncia Voluntaria, Redención y Compraventa de Acciones Corporativas"* (acuerdo o pacto).[2] En este acuerdo se hizo constar que no empece la fecha de su otorgamiento, éste sería efectivo desde el día **31 de agosto de 2010.** Como parte del acuerdo, la CPA Serra Torres cedió la totalidad de su participación en Reyes Ramis CPA Group, PSC, y recibió a cambio la suma de $150 mil, la cual se le pagaría dentro de un período de 5 años, a razón de $1,454.44 quincenal. En ese pacto se incluyó una cláusula relacionada con un compromiso de no competencia, que lee de la forma siguiente:

> DÉCIMO SÉPTIMO: Que de acuerdo con las disposiciones del CONTRATO, y en cuanto al caso de una renuncia voluntaria se refiere, se establece que los clientes servidos por parte de REYES-RAMIS CPA GROUP, PSC, son propiedad exclusiva de la entidad, excepción hecha de los clientes traídos por la ACCIONISTA SALIENTE al unirse a la CORPORACIÓN. En relación con lo cual, la ACCIONISTA SALIENTE renuncia a solicitar o prestarle a dichos clientes servicios similares a los prestados por la CORPORACIÓN, de manera tanto directa como indirecta, ya sea por sí o a través de cualquier otra entidad o persona, independientemente de la capacidad en que tales servicios sean prestados. **Cuyo acuerdo o renuncia tendrá un término o período de vigencia hasta el día 31 de**

---

corporación dueña del edificio donde ubica la oficina principal de Reyes Ramis CPA Group, PSC.

[2] Íd., pág. 136.

> **diciembre de 2011.** En caso de que la ACCIONISTA SALIENTE incumpla con dicha obligación, ésta se obliga a pagarle a la CORPORACIÓN tres (3) veces la facturación promedio de dichos clientes, conforme a los servicios prestados por la entidad a los mismos durante los últimos tres (3) años de servicio, como compensación y/o indemnización a favor de la CORPORACIÓN, independientemente del tipo de servicio que dicha accionista le provea. Cuyo pago o indemnización no podrá ser diferido de modo alguno. El cual puede ser utilizado por parte de la CORPORACIÓN para reducir ("set-off") el pago a serle hecho a la ACCIONISTA SALIENTE a cambio de su participación en la entidad, a ser utilizado de ese modo sujeto a la discreción o determinación absoluta de la CORPORACIÓN. A esos efectos, se incluye como parte integral de la presente [el] Listado de Clientes pertenecientes a REYES-RAMIS CPA GROUP, PSC. (Énfasis suplido).[3]

El 30 de diciembre de 2010, Reyes Ramis CPA Group, PSC, presentó una demanda por incumplimiento de contrato y daños y perjuicios contra la CPA Serra Torres, su esposo y la sociedad legal de bienes gananciales integrada por ambos. Planteó, en síntesis, que la CPA Serra Torres incumplió la referida cláusula de no competencia, pues se habían identificado al menos 6 clientes de la corporación profesional que la CPA Serra Torres estaba atendiendo.

La CPA Serra Torres y su esposo contestaron la demanda y reconvinieron el 28 de febrero de 2012.[4] En su

---

[3] Apéndice de la Petición de *certiorari* en caso CC-2014-0744, pág. 149.

[4] En la reconvención, la CPA Serra Torres, su esposo y la sociedad legal de bienes gananciales compuesta por ambos plantearon que Reyes Ramis CPA Group, PSC, violó el pacto suscrito, pues ésta no había realizado el pago de tres o más plazos consecutivos de la cantidad

contestación, adujeron que la cláusula de no competencia es nula porque excede el término de 1 año. El 15 de marzo de 2012, la CPA Serra Torres, su esposo y la sociedad legal de bienes gananciales compuesta por ambos presentaron una demanda contra terceros, específicamente en contra del CPA Reyes Ramis, la Sra. Rosaura Marín Nieves, el CPA Colón Álvarez, la Sra. Yolanda Serrano Burgos y sus respectivas sociedades legales de bienes gananciales, en la que adoptaron por referencia todas las alegaciones de la reconvención y plantearon que todos los terceros demandados se comprometieron de forma solidaria a las obligaciones acordadas en el pacto y responden por la violación del mismo.

El 2 de octubre de 2012, la CPA Serra Torres y su esposo presentaron una moción de sentencia sumaria debidamente cumplimentada en la que argumentaron, en síntesis, que no existía controversia sustancial en cuanto a que la vigencia de la cláusula de no competencia sería del **31 de agosto de 2010 al 31 de diciembre de 2011, por lo que excedía el término de 1 año.**

---

pactada y ello era causa suficiente para reclamar el balance total de la deuda, según lo acordado. Además, expusieron que Reyes Ramis CPA Group, PSC, violó el acuerdo al no efectuar unos pagos al seguro social y al Medicare, y al cancelar unilateralmente el plan médico de la CPA Serra Torres, lo que le causó a ésta graves sufrimientos y angustias mentales. Por eso, solicitaron el pago del balance total de la deuda ($123,449.43), el pago de la penalidad por mora de un 10% del balance adeudado, el pago de $15 mil para costas y honorarios de abogado, el pago de interés pactado de 6% desde el 1 de noviembre de 2010 y el pago de los intereses legales por temeridad desde el 1 de septiembre de 2011. Asimismo, pidieron una compensación de $100 mil por los daños causados a la CPA Serra Torres y $2,500.53 por el incumplimiento con el pago al seguro social y al Medicare.

Reyes Ramis CPA Group, PSC, replicó y alegó que la CPA Serra Torres había tenido asesoría jurídica antes de firmar el acuerdo y que no había mostrado objeción alguna respecto a la cláusula de no competencia. Asimismo, argumentó que el pacto fue suscrito como parte de la renuncia de la CPA Serra Torres a Reyes Ramis CPA Group, PSC, y no como parte de un contrato de empleo.

Luego de evaluar la solicitud de sentencia sumaria presentada por la CPA Serra Torres y su esposo, así como la oposición, el Tribunal de Primera Instancia, en reconsideración, la declaró "ha lugar". En consecuencia, desestimó con perjuicio mediante Sentencia Parcial la reclamación de Reyes Ramis CPA Group, PSC, contra la CPA Serra Torres, su esposo y la sociedad legal de bienes gananciales compuesta por ambos.

En lo pertinente, el foro de instancia fundamentó su decisión en que el acuerdo de no competencia incumplía con lo establecido en Arthur Young & Co. v. Vega III, supra. Inconformes, tanto Reyes Ramis CPA Group, PSC, como los terceros demandados presentaron recursos por separado ante el Tribunal de Apelaciones y éstos fueron consolidados.

Así las cosas, el 22 de mayo de 2014, dicho foro apelativo confirmó la Sentencia Parcial apelada. El foro apelativo intermedio concluyó que las circunstancias del caso de epígrafe son similares a las de Arthur Young & Co. v. Vega III, supra, y enfatizó en que el acuerdo "surgió en el contexto del fin de una relación, no solo corporativa, sino laboral". Por todo lo cual, determinó

que el foro de instancia no erró al aplicar los criterios de validez para una cláusula de no competencia, según expuestos en Arthur Young & Co. v. Vega III, supra.

Inconforme, las partes peticionarias presentaron ante esta Curia los recursos CC-2014-0744 y CC-2014-0765. El 24 de septiembre de 2014, en auxilio de nuestra jurisdicción paralizamos los procedimientos ante el Tribunal de Primera Instancia y consolidamos ambos recursos. El 31 de octubre de 2014, este Tribunal expidió ambos recursos. El 1 de junio de 2015, la parte peticionaria presentó su alegato. El 4 de agosto de 2015, la parte recurrida hizo lo propio, por lo que el caso quedó finalmente perfeccionado.

En su alegato, y en lo pertinente, las partes peticionarias presentaron los siguientes errores:

1. Erró el Honorable Tribunal de Apelaciones al confirmar la Sentencia del Tribunal de Instancia que decretó la nulidad de la cláusula de no competencia del contrato de redención de acciones corporativas por ser contraria al caso de Arthur Young v. Vega III, 136 D.P.R. 157 (1994).

2. Erró el honorable foro intermedio al confirmar la nulidad de la cláusula de no competencia sobre la premisa de que incumple los postulados de Arthur Young v. Vega III, 136 D.P.R. 157 (1994), cuando el contrato base no era uno de empleo, sino un contrato de compraventa de acciones corporativas.

## II

"En Puerto Rico, como regla general, los acuerdos de no competencia son válidos con base en el principio de

libertad de contratación".[5] Como sabemos, el Art. 1207 del Código Civil, en su parte pertinente, establece que:

> Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral, ni al orden público. [6]

En síntesis, cuando hablamos de contratos, la autonomía que tienen las partes para contratar privadamente comprende la expresión de la libertad personal, de modo que cada cual pueda ejercitar facultades y derechos, y también conformar las diversas relaciones jurídicas que le atañen.[7] Como sostiene Puig Brutau:

> [L]a posibilidad de dos o más personas de quedar obligadas por su propia iniciativa significa el reconocimiento del poder creador de la autonomía de la voluntad. Esta autonomía significa que, en principio, todo particular puede contratar cuando quiera, como quiera y con quien quiera.[8]

Ahora bien, "[l]a libertad de contratación privada no es irrestricta".[9] El Art. 1207 de nuestro Código Civil impone tres salvedades principales sobre este principio: "los contratos no pueden ser contrarios a las leyes, a la moral o al orden público".[10]

---

[5] Martin's BBQ v. García de Gracia, 178 DPR 978, 990 (2010).

[6] 31 LPRA sec. 3372.

[7] Cooperativa Sabaneña v. Casiano Rivera, 184 DPR 169 (2011).

[8] J. Puig Brutau, Fundamentos del Derecho Civil, 3ra ed., Barcelona, Ed. Bosch, 1988.

[9] Hernández v. Méndez & Assoc. Dev. Corp., 105 DPR 149, 153 (1976).

[10] 31 LPRA sec. 3372.

## III

Este Tribunal tuvo la oportunidad de expresarse con relación a la validez en nuestro ordenamiento contractual de las cláusulas de no competencia en los casos normativos de Arthur Young & Co. v. Vega III, supra,[11] y Martin's BBQ v. García de Gracia, supra. Repasemos entonces algunos aspectos de esa jurisprudencia, que nos son pertinentes para disponer de la presente controversia.

### A. Arthur Young & Co. v. Vega III, supra

En Arthur Young & Co. v. Vega III, supra, nos expresamos por primera vez en nuestra jurisdicción en torno a las cláusulas de no competencia en el campo laboral. El caso trata de un joven contador público autorizado, el Sr. Virgilio Vega III (CPA Vega III), de apenas 26 años de edad, que en el 1982 iniciaba su carrera al firmar un contrato de trabajo como *Staff Accountant* en el Departamento de Auditoría de la firma de contabilidad Arthur Young & Company (Arthur Young). Durante los tres años siguientes a la firma del contrato, el CPA Vega III recibió tres ascensos de categoría, con tres correspondientes aumentos de salario, para finalmente ser ascendido a uno de los puestos de gerente dentro del mismo departamento. Como requisito para el puesto de gerente, el CPA Vega III tuvo que firmar "un[o]s contrato[s] de trabajo con una cláusula accesoria de no competencia" que, en síntesis, le prohibía que durante un período de 2 años,

---

[11] La norma adoptada en este caso fue reiterada y aplicada en PACIV, Inc. v. Pérez Rivera, 159 DPR 523 (2003).

contados a partir de su salida de la compañía pudiera realizar labores para cualquiera que hubiera sido cliente de Arthur Young durante los pasados 12 meses, o a quien Vega III directamente le hubiera brindado servicio como cliente de Arthur Young por los pasados 5 años.[12]

Aproximadamente tres años después de su ascenso a gerente, el CPA Vega III renunció a Arthur Young y abrió su propia oficina, en donde contrató para dar servicio a un cliente activo de Arthur Young. Como consecuencia, Arthur Young demandó al CPA Vega III alegando que éste había incumplido con su contrato de trabajo al violar la cláusula de no competencia.

En ese caso, al confirmar al Tribunal de Primera Instancia, adoptamos la norma de razonabilidad aplicada por los tribunales estadounidenses como mecanismo para evaluar la validez de una cláusula de no competencia, en una relación patrono-empleado. Así, establecimos los parámetros necesarios para cumplir con esa razonabilidad, señalando que:

> [p]ara ser razonable, un acuerdo de no competir debe reunir los requisitos siguientes: (1) debe ser necesario para proteger un interés legítimo del patrono; (2) no debe imponer al empleado una carga demasiado onerosa, y (3) no debe afectar demasiado al público.[13]

---

[12] <u>Arthur Young & Co. v. Vega III</u>, 136 DPR 157, 163 (1994).

[13] Íd., pág. 167.

Además, en Arthur Young & Co. v. Vega III, supra, también fijamos los requisitos específicos para la validez de una cláusula de no competencia en un contrato del tipo patrono-empleado. Señalamos, en primer lugar, la necesidad por parte del patrono de un interés legítimo en el acuerdo. Esto es, "que de no recibir la protección de una cláusula de no competencia, su negocio se vería sustancialmente afectado".[14] Segundo, establecimos que "el alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término y lugar de restricción o clientes afectados".[15]

En cuanto al término de no competencia, señalamos que en este tipo de acuerdo patrono-empleado lo razonable es que el mismo no debe excederse de doce meses, "entendiéndose que cualquier tiempo adicional es excesivo e innecesario para proteger adecuadamente al patrono".[16]

Respecto al alcance de la prohibición, indicamos que una cláusula de no competencia debe contener un lenguaje que limite su aplicación al interés del patrono que se persigue proteger. En ese sentido, precisamos que "el contrato debe especificar los límites geográficos o los clientes afectados". (Énfasis suplido).[17] No obstante, es importante destacar que esta Curia no estableció como requisito constitutivo de un acuerdo de no competencia el

---

[14] Íd., pág. 175.

[15] Íd.

[16] Íd.

[17] Íd., págs. 175-176.

que se limite geográficamente las restricciones impuestas **y** los clientes que estarán comprendidos. Esa conjunción disyuntiva "o" tiene el efecto de desvincular las palabras entre las cuales es usada.[18] Por lo tanto, no es correcto afirmar que todo contrato de no competencia debe contener una restricción territorial y de clientela, basta con una de ellas.

Es decir, con relación al lugar de restricción o los clientes afectados por la cláusula, es claro que ambos requisitos se dan en la alternativa. Ahora bien, cuando la cláusula de no competencia indique un área geográfica a la que aplica la restricción, "ésta debe limitarse a la estrictamente necesaria para evitar la competencia real entre el patrono y el empleado".[19] Por otra parte, cuando la prohibición de competencia señale los clientes a los que se extiende "debe referirse sólo a aquellos que el empleado atendió personalmente durante un período razonable de tiempo antes de renunciar o en un período inmediatamente anterior a la renuncia, y que al hacerlo todavía eran clientes del patrono".[20]

En tercer lugar, para la validez de una cláusula de no competencia, se requiere que el patrono ofrezca "una contraprestación a cambio de la firma del acuerdo de no competir por parte del empleado".[21] En cuarto lugar, un

---

[18] _Mari Bras v. Alcaide_, 100 DPR 506, 515 (1972).

[19] _Arthur Young & Co. v. Vega III_, supra, pág. 176.

[20] Íd.

[21] Íd.

contrato con una cláusula de no competencia "debe contar con los elementos esenciales para su validez: consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 LPRA sec. 3391".[22] En quinto lugar, establecimos que para este tipo de pacto se hace indispensable que el mismo conste por escrito.[23]

Por último, pero no menos importante, establecimos que se requiere que la cláusula de no competencia sea **"incidental a un contrato de trabajo**, y que ha mediado causa adecuada". (Énfasis suplido). [24]

## B. Martin's BBQ v. García de Gracia, supra.

En Martin's BBQ v. García de Gracia, supra, examinamos, por primera vez, la validez de una cláusula de no competencia en un contrato de franquicia. En ese entonces, señalamos que los contratos de franquicia incluyen frecuentemente cláusulas de no competencia con el propósito de limitar o prohibir la competencia "tanto durante la vigencia del contrato como con posterioridad a ésta".[25] Amparados en precedentes previos, expusimos que "no todo acuerdo de no competencia que complementa un negocio o un acuerdo entre competidores potenciales es de

---

[22] Íd.

[23] Íd.

[24] Íd., pág. 167.

[25] Martin's BBQ v. García de Gracia, supra, pág. 994.

por sí y, sin más, ilegal y detrimental a la competencia".[26]

También, señalamos que "la relación existente en un Contrato de Franquicia entre el franquiciante y franquiciado no es de patrono-empleado, sino entre empresarios, por lo que los intereses que afectan la razonabilidad de este tipo de restricción son distintos".[27] En ese análisis, resaltamos la falta de uniformidad en el trato de ese tipo de cláusulas entre las distintas jurisdicciones estadounidenses. Algunas jurisdicciones comparan las cláusulas de no competencia incluidas en los contratos de franquicia con aquellas incluidas en los contratos de venta de negocio y otras con las cláusulas presentes en los contratos de empleo.[28] No obstante, destacamos la existencia, a nuestro juicio, de diferencias relevantes entre la relación de las partes en un contrato de franquicia y en otro tipo de relaciones contractuales. De manera que, luego de analizar los pormenores y detalles de aquel tipo de relación contractual, reconocimos que a pesar de que el franquiciado no es cabalmente comparable con un empleado, sí existe una subordinación económica del franquiciado al momento de establecer ese tipo de relación comercial.[29]

---

[26] Íd., pág. 993.

[27] Íd., pág. 996.

[28] Íd., pág. 995.

[29] Íd., págs. 996-997.

Por consiguiente, para evaluar los acuerdos de no competencia en el ámbito de relaciones comerciales extendimos la aplicación de la regla de razonabilidad utilizada en la mayoría de las jurisdicciones estatales americanas.[30] Además, contrario a la norma existente para los contratos del tipo patrono-empleado, rehusamos establecer parámetros rígidos para su validez. Aun cuando acogimos esa postura, establecimos un enfoque de reciprocidad en cuanto a los límites territoriales y limitamos las actividades restringidas a aquellas que pongan al franquiciante en desventaja competitiva.[31]

Así, concluimos que el término de dos años de prohibición de no competencia era razonable ante las particularidades de ese caso.[32] Sin embargo, luego de analizar todas las circunstancias fácticas, determinamos que la cláusula de no competencia impuesta por Martin's BBQ excedía las restricciones geográficas necesarias para proteger razonablemente los intereses legítimos de éste.[33] Por esa razón, resolvimos que la cláusula era inválida a la luz del principio de reciprocidad y razonabilidad.[34]

En Martin's BBQ v. García de Gracia, supra, también expusimos que las cláusulas de no competencia "las hallamos particularmente en los contratos de empleo, venta

---

[30] Íd., pág. 998.

[31] Íd., pág. 999.

[32] Íd., pág. 1001.

[33] Íd., pág. 1002.

[34] Íd.

de negocios y franquicias", reconociendo de esa forma que este tipo de cláusula restrictiva se utiliza en otros tipos de contratos.[35]

## IV

Los peticionarios le imputan como error principal a los foros recurridos la aplicación extensiva de la normativa de Arthur Young & Co. v. Vega III, supra, para relaciones contractuales de naturaleza patrono-empleado al contrato habido en este caso. En su Sentencia, el Tribunal de Apelaciones señaló que las circunstancias en el caso de autos son similares a la del caso de Arthur Young & Co. v. Vega III, supra, enfatizando que el acuerdo "surgió en el contexto del fin de una relación, no solo corporativa, sino laboral". Específicamente, el foro apelativo intermedio fundamentó su decisión señalando lo siguiente:

> Somos del criterio que, distinto a la interpretación planteada por la Corporación, que alega que el Acuerdo fue producto de una mera compraventa de acciones, dicho pacto se suscitó por el deseo de la Sra. Serra de retirarse voluntariamente de su participación como accionista de la corporación profesional en la que desempeñaba su oficio de CPA. Nótese que se alegó además que su esposo, el Sr. Santiago, también laboró para la Corporación. Vemos entonces que el Acuerdo surgió en el contexto del fin de una relación, no solo corporativa, sino laboral.

Contrario a la conclusión a la que llegó el Tribunal de Apelaciones, las circunstancias del caso de autos son

---

[35] Íd., pág. 990.

muy diferentes a las del caso de <u>Arthur Young & Co. v.</u> <u>Vega III</u>, supra. En el caso de autos existe una distinción fundamental en el negocio jurídico involucrado que impide la aplicación sistemática de ese precedente.

En esta ocasión estamos ante un contrato de compraventa de acciones de una corporación de servicios profesionales y no ante un contrato de empleo. El poder de negociación que tenían las partes para negociar al momento de contratar y el momento en que lo hicieron me permite llegar a esta conclusión. Como señalé, del expediente de autos surge que los peticionarios se comprometieron a pagarle a la CPA Serra Torres $150,000 por la compra de sus acciones, cantidad para la cual se emitió un pagaré por 5 años a 6% de interés, pagaderos bimensualmente.[36] Además, se acordó que ésta continuaría disfrutando de un plan médico cuyo costo se descontaría de los pagos bimensuales que, por la venta de sus acciones, la CPA Serra Torres recibiría.[37] Como podemos ver, las contraprestaciones que recibiría la CPA Serra Tores como parte del contrato en el que se estableció la cláusula de no competencia son en realidad el pago por la venta de sus acciones y en nada se relacionan con funciones laborales presentes o futuras en la firma o con un contrato de trabajo. Así, las prestaciones a recibirse por parte de la

---

[36] Apéndice de la Petición de *certiorari* en caso CC-2014-0744, págs. 142-143.

[37] Íd., pág. 145.

CPA Serra Torres no guardan relación -no se derivan o son incidentales- a un contrato de trabajo.

Por lo tanto, contrario a la conclusión a la que llegaron los foros inferiores, la cláusula de no competencia bajo análisis no tenía que ajustarse íntegramente a las estrictas condiciones establecidas en Arthur Young & Co. v. Vega III, supra. Es claro que *Arthur Young,* supra, es un caso que se enmarca en una relación típica de patrono-empleado, en la que existe una clara disparidad entre las fuerzas para negociar al establecer la cláusula de no competencia. Mientras en Arthur Young & Co. v. Vega III, supra, la cláusula de no competencia surgió cuando "[a]l momento de su promoción a gerente, Vega firmó un contrato de trabajo",[38] la cláusula de no competencia en el caso de autos surge de un "*Acuerdo Privado de Renuncia Voluntaria, Redención y Compraventa de Acciones Corporativas*". Por esta razón, la cláusula de no competencia en controversia se origina como parte de un contrato de renuncia y venta de acciones, y no uno de naturaleza laboral. Como señalamos en Arthur Young & Co. v. Vega III*,* supra*,* una cláusula de no competencia en el contexto de una relación patrono-empleado tiene que ser incidental a un contrato de trabajo, en el cual haya mediado causa adecuada.

En esa misma línea, los tribunales estatales en Estados Unidos han establecido una diferencia en el

---

[38] Arthur Young & Co. v. Vega III, supra, pág. 163.

tratamiento de las cláusulas de no competencia cuando se trata de un contrato de empleo y cuando ésta es corolario de un contrato de compraventa.[39] A juicio de estos pronunciamientos jurisprudenciales, el orden público tutelado es distinto en ambas circunstancias, pues el contrato de empleo reviste mayor resguardo por tratarse de una situación en la que el poder de negociación del empleado es mucho menor al del patrono.[40] Precisamente, fue esta consideración de orden público la que este Tribunal quiso proteger cuando decidió Arthur Young & Co. v. Vega III, supra.

Aclarado lo anterior, corresponde precisar qué principios deben limitar la autonomía de la voluntad de las partes en el tipo de contrato que nos ocupa.

**V**

**A. Ley General de Corporaciones**

Según mencioné, la cláusula de no competencia objeto de discusión en este caso forma parte de un contrato de renuncia y venta de acciones de una corporación profesional. Con relación a la venta y transferencia de acciones en este tipo de entidad corporativa, el Art. 18.10 de la Ley General de Corporaciones de 2009[41] establece que ningún accionista de una corporación de servicios profesionales puede vender o transferir sus

---

[39] Véanse, Decker, Berta & Co. v. Berta, 587 N.E.2d 72, 74 (Ill. App. Ct. 1992); Hamer Holding Grp., Inc. v. Elmore, 560 N.E.2d 907, 915 (Ill. App. Ct. 1990).

[40] Íd.

[41] 14 LPRA sec. 3930.

acciones en la corporación, salvo a la propia corporación, o a otro individuo calificado para ser accionista de dicha corporación. Consecuentemente, el Art. 18.13 de este cuerpo normativo[42] contempla la transferencia de acciones en caso de la renuncia de uno de los accionistas de la corporación profesional y prescribe que, en tal eventualidad, esas acciones podrán ser adquiridas por la corporación o por uno o varios de sus accionistas.

Según se puede colegir, estos artículos dictan las exigencias con las que debe cumplir una transferencia de acciones de una corporación profesional debidamente organizada. No obstante, esta legislación no incluye preceptos que regulen los contratos otorgados para realizar transferencia y mucho menos impone requisito alguno respecto a las cláusulas de no competencia en este tipo de transacción comercial. Por lo tanto, un contrato de renuncia y venta de acciones de una corporación profesional se rige enteramente por nuestro derecho contractual.

**B. <u>Contratos para la venta de negocios entre socios</u>**

Principalmente, las relaciones contractuales en las que se ha reconocido la inclusión de cláusulas restrictivas de no competencia comprenden el vendedor de un negocio que traspasa su plusvalía (*good will*) y se obliga a no competir con el comprador; el empleado que al terminar su relación laboral con un patrono se obliga a no

---

[42] 14 LPRA sec. 3933.

competir con éste, y el socio de una sociedad que se obliga a no competir al separarse de ella.[43] Como resultado, éstas forman parte de contratos laborales, contratos para la venta de empresas y acuerdos de sociedades.[44]

Las cláusulas de no competencia han sido objeto de mucha discusión y litigación a través de los años.[45] Los tribunales en la mayoría de las jurisdicciones en los Estados Unidos se han mostrado dispuestos a sostener la validez de este tipo de cláusulas cuando el contrato versa sobre la venta de un negocio.[46] Las cláusulas de no competencia dentro de la venta de un negocio son usualmente sostenidas como necesarias para asegurar la plusvalía (*good will*) que adquiere el comprador.[47] En vista de que la plusvalía y el negocio en marcha (*ongoing business asset*) de una empresa es una consideración sopesada dentro de una transacción de compraventa, se ha reconocido que el comprador merece protección contra la

---

[43] Restatement (Second) of Contracts, Sec. 188 (2)(c) (1981). ("*Promises imposing restraints that are ancillary to a valid transaction or relationship include the following: (a) a promise by the seller of a business not to compete with the buyer in such a way as to injure the value of the business sold; (b) a promise by an employee or other agent not to compete with his employer or other principal; (c) a promise by a partner not to compete with the partnership*").

[44] Serena L. Kafker, Golden Handcuffs: Enforceability of Noncompetition Clauses in Professional Partnership Agreements of Accountants, Physicians, and Attorneys, 31 Am. Bus. L.J. 31, 33 (1993).

[45] S. Stroud, Non-compete agreements: weighing the interests of profession and firm, 53 Ala. L. Rev. 1023 (2003).

[46] Íd.

[47] Williams v. Powell Elec. Mfg. Co., 508 S.W.2d 665, 667 (Tex. Civ. App. 1974).

posible competencia del expropietario vendedor.[48] En otras palabras, el vendedor incluye, como parte del precio de venta, la plusvalía del negocio que ha construido, por lo que se considera injusto permitir que éste pueda privar al comprador de esa plusvalía recién adquirida al poner en marcha una empresa competidora.[49]

Así, varios estados de la Unión han aprobado leyes que prohíben los acuerdos de no competencia, excepto los vinculados a la venta de un negocio y la disolución de una sociedad.[50] La consideración principal para este trato preferencial se debe a que las circunstancias presentes en esos escenarios rodean profesionales con el mismo poder de negociación y que por consideraciones mutuas han pactado este tipo de cláusulas. Las disoluciones de sociedades profesionales se consideran a menudo como una venta de un negocio, pues el socio saliente transfiere su participación en la sociedad a los socios restantes.[51] Esto difiere del contexto presente en los contratos de

---

[48] Kafker, *supra*, pág. 34.

[49] M.R.S. Datascope, Inc. v. Exchange Data Corp., Inc., 745 S.W.2d 542, 545-546 (Tex. App. 1988).

[50] Véanse, por ejemplo, ALA.CODE § 8-1-1 (1984 Michie); CAL.BUS. & PROF.CODE §§ 16601, 16602 (West 1987); FLA.STAT.ANN. § 542.33 (Harrison Supp.1989); GA.CODE ANN. §§ 13-8-2 to-2.1 (Supp. Michie 1991); HAW.REV.STAT. § 480.4 (1985); LA.REV.STAT.ANN. § 23.921 (West 1985 and Supp.1990); MICH.COMP.LAWS ANN. §§ 445.772-74 (West 1991); MONT.CODE ANN. §§ 28-2-703-705 (1990); N.C.GEN.STAT. §§ 75-1 & 75-1.1(b) (Michie 1988); N.D.CENT.CODE § 9-08-06 (Michie 1987); OKLA.STAT. tit. 15, §§ 217-219 (West Supp.1990); S.D.CODIFIED LAWS ANN. §§ 53-9-8 to-10 (Michie 1990).

[51] 2 Employment Law § 8:1 (5th ed.).

trabajo, en los que las partes no tienen el mismo poder de negociación y la restricción se impone unilateralmente.[52]

La aplicabilidad de las cláusulas de no competencia en el marco de los acuerdos de sociedades o corporaciones profesionales cuando un socio se retira es un área creciente de la doctrina.[53] Por un lado, el profesional que se retira de la firma o corporación profesional alega que se le debe permitir continuar su vida haciendo aquello para lo que se preparó profesionalmente. Por el otro lado, la firma inherentemente pierde dinero y clientes cuando un socio los abandona y, por lo tanto, busca proteger sus intereses.[54] Además, las firmas o corporaciones profesionales también reclaman que las cláusulas restrictivas en sus contratos con sus socios se justifican en la medida que buscan evitar que aquellos nuevos socios que llegan sin experiencia, las abandonen después de haber adquirido experiencia y una buena base de clientes.[55] Los distintos tribunales en las jurisdicciones estatales americanas han aplicado diferentes estándares cuando se ven estas restricciones en acuerdos de firmas o corporaciones profesionales de contadores, médicos y abogados.[56]

---

[52] Kafker, *supra*, págs. 33-34.

[53] Kafker, *supra*, pág. 34.

[54] S. Stroud, Non-compete agreements: weighing the interests of profession and firm, 53 Ala. L. Rev. 1023 (2003).

[55] McLean v. Michaelowsky, 117 Misc. 2d 699 (Sup. Ct. 1983).

[56] Kafker, *supra*, pág. 34.

Ahora bien, en cuanto a la interpretación de las cláusulas de no competencia en acuerdos entre profesionales de la contabilidad,[57] la mayoría de las jurisdicciones en los Estados Unidos coinciden en utilizar el mismo criterio general de razonabilidad que adoptamos en Arthur Young & Co. v. Vega III, supra, y que reiteramos en Martin's BBQ v. García de Gracia, supra.[58] En la determinación de la razonabilidad de este tipo de cláusula, los siguientes factores deberán ser considerados a la luz de la totalidad de las circunstancias: el área geográfica involucrada, la duración de la restricción de competencia y el alcance de la actividad prohibida. Es menester señalar que, según reconocimos en Martin's BBQ v. García de Gracia, supra, ninguno es determinante por sí solo, pues el resultado del análisis dependerá de las particularidades del negocio del que se trata y los intereses de las partes. Siendo estos los parámetros utilizados en estos precedentes, no veo impedimento para

---

[57] Al analizar este tipo de contrato con cláusulas restrictivas, la jurisprudencia de prácticamente todas las jurisdicciones de Estados Unidos utiliza el término "socio" o "sociedad" indistintamente de la forma corporativa en que la firma de contabilidad se haya organizado legalmente. Por eso, señalamos que en este contexto el término "socio" o "sociedad" no tiene el significado de la entidad jurídica que establece nuestro Código Civil (31 LPRA sec. 4318). Por otro lado, y como se señala en la Exposición de Motivos de la Ley Núm. 301-1998 que añadió el Art. 18.17 de nuestra Ley General de Corporaciones (31 LPRA sec. 3501), "[e]l rol y la figura de los accionistas de una corporación profesional bajo el nuevo régimen corporativo es el equivalente jurídico al de los socios industriales de una sociedad profesional". Tras la aprobación de la Ley Núm. 164-2009 el antiguo Art. 18.17 pasó a ser el actual Art. 18.18 de la Ley General de Corporaciones y su texto permaneció inalterado. El término "socio" según utilizado en esta Opinión de Conformidad aplica igualmente a accionistas de una entidad corporativa.

[58] Stroud, supra, pág. 1031; Kafker, supra, pág. 35.

extender la adopción de tales criterios a las circunstancias del caso de autos.[59]

Sin embargo, aunque los parámetros son similares a los adoptados en Arthur Young & Co. v. Vega III, supra, el hecho de que en circunstancias como las del caso de autos no existe una marcada desigualdad entre las partes contratantes, hace el escrutinio de la regla de razonabilidad menos estricto que el utilizado en el caso de contratos del tipo patrono-empleado.[60] Esto es, el examen de razonabilidad se aplica estrictamente en casos que involucren una relación patrono-empleado y sujeto a las condiciones específicas pautadas en Arthur Young & Co. v. Vega III, supra, mientras que se debe emplear un estudio menos riguroso que respete la autonomía de contratación de las partes para las cláusulas restrictivas que se derivan de acuerdos entre accionistas o socios de corporaciones y firmas profesionales. Y es que, como señalé, no existe una marcada desigualdad entre las partes. Los socios en una corporación de servicios profesionales negocian desde plataformas relativamente parejas.[61]

En cuanto a qué término es razonable en cláusulas de no competencia para circunstancias como las del caso de

---

[59] Los socios contables peticionarios no han argumentado que su situación profesional requiera una norma diferente y el Código de Conducta Profesional del Instituto Americano de Contadores Públicos Certificados no contempla este asunto.

[60] Stroud, *supra*, pág. 1032.

[61] Rash v. Toccoa Clinic Med. Assoc., 253 Ga. 322 (1984).

autos, en controversias parecidas entre socios de corporaciones de servicios profesionales, los tribunales en las distintas jurisdicciones de los Estados Unidos han avalado como razonables unas cláusulas de no competencia que varían **entre 2 años a 5 años**.[62] Lo que se puede considerar razonable en un caso puede que no lo sea en otro al sopesar los elementos en juego.[63]

Si bien las cláusulas de no competencia provienen del derecho norteamericano, debemos resaltar que igual camino se ha seguido en España. La sentencia más reciente sobre este tema versa sobre un socio de la sociedad limitada, Cauchos Puntes, S.L., que decidió vender su participación a raíz de serias desavenencias habidas entre los socios que la componían. Como parte del contrato de compraventa de participaciones sociales (acciones), se estipuló una cláusula de no competencia. Posteriormente, se alegó la nulidad de la cláusula restrictiva. En la Sentencia de 18 de mayo de 2012, el Tribunal Supremo de España, al desestimar el recurso presentado, sostuvo que:

> En el presente caso, pese a que no se trata de la venta de una empresa sino de la de un importante paquete de participaciones por quien hasta fechas recientes había sido gerente de la empresa explotada por la sociedad cuyas participaciones enajenaba y trataba con

---

[62] Véanse, <u>Mayer Hoffman McCann, P.C. v. Barton</u>, 614 F.3d 893 (8th Cir. 2010); <u>Schuhalter v. Salerno</u>, 653 A.2d 596 (N.J. Super. Ct. App. Div. 1995); <u>Wirum & Cash, Architects v. Cash</u>, 837 P.2d 692 (Alaska 1992); <u>Holloway v. Faw, Casson & Co</u>, 552 A.2d 1311 (Md. Ct. Spec. App. 1989); <u>Fuller v. Brough</u>, 411 P.2d 18 (Colo. 1966); <u>Mabray v. Williams</u>, 291 P.2d 677 (Colo. 1955); Larry D. Carlson, <u>Enforcing a Non-Compete</u>, 4 Tex. Intell. Prop. L.J. 149, 155 (1996).

[63] <u>Martin's BBQ v. García de Gracia</u>, supra, pág. 999.

clientes y proveedores, el pacto de no competir se enmarca dentro de un contrato cuya finalidad no es restringir la competencia. **En este contexto la cláusula de inhibición está justificada salvo que por su duración, su ámbito geográfico y su contenido excediese de lo razonablemente útil o conveniente para garantizar que el valor de las participaciones no se viera deteriorado por la actuación del transmitente.** (Énfasis Suplido).[64]

En fin, para cumplir con la regla de la razonabilidad, entiendo que las restricciones en cuanto al tiempo, área geográfica y actividades deben ser razonablemente necesarias para proteger los intereses legítimos del adquirente de la participación o negocio en venta.

**VI**

Al analizar con detenimiento el "*Acuerdo Privado de Renuncia Voluntaria, Redención y Compraventa de Acciones Corporativas*" suscrito entre la CPA Serra Torres y Reyes Ramis CPA Group, PSC, y aplicar los criterios jurídicos antes esbozados entiendo que la cláusula de no competencia objeto de controversia no es irrazonable para adelantar los intereses de la firma. Se ha reconocido que una firma o corporación profesional tiene un interés legítimo en salvaguardar su clientela, su plusvalía (*good will*) y su

---

[64] El Tribunal Supremo de España tomó en consideración que "en numerosas ocasiones el tráfico mercantil impone o aconseja ciertas restricciones a la competencia, en cuyo caso las cláusulas de inhibición, de estar incorporadas a contratos cuyo objeto principal no sea restringir, impedir o falsear la competencia, que constituya restricciones accesorias del comercio, más o menos necesarias o simplemente útiles o convenientes, por lo que **se alude su validez cuando están suficientemente justificadas y sirven a la finalidad perseguida en un contrato lícito**". (Énfasis suplido).

negocio en marcha (*ongoing business asset*). Más aún, cuando el negocio en marcha o parte de éste se vendió por el retiro de un socio o accionista de la firma o corporación profesional, ese interés se hace acreedor de nuestro aval. De no resguardar este interés tutelado contractualmente por las partes, el adquiriente de las acciones o la participación pagaría por el caparazón vacío de un negocio, que el vendedor podría llevarse consigo tras la compraventa.

En el caso de autos, el término de la cláusula de no competencia se extiende por un periodo de 16 meses. Aunque la restricción impuesta no especifica una restricción geográfica, se limitó el alcance de la actividad prohibida a los clientes servidos por Reyes Ramis CPA Group, PSC, con excepción de los clientes traídos por la CPA Serra Torres al unirse a la firma. Es decir, estamos ante un acuerdo de no competencia que, si bien no está definido en cuanto a un área geográfica, está limitado en lo que se refiere a la competencia por cierta clientela. En cuanto a estos clientes, la CPA Serra Torres se comprometió a no brindarles servicios similares a los prestados por la firma, ya fuese por sí o a través de cualquier tipo de entidad. En caso de incumplimiento con esta obligación, la CPA Serra Torres pactó pagarle como indemnización a la firma tres veces la facturación promedio de dichos clientes, conforme a los servicios prestados por la entidad durante los últimos tres años de servicios.

Esta limitación acordada por la CPA Serra Torres y sus socios no es excesiva ante el interés tutelado. El acuerdo de no competencia tiene claramente delimitado la lista de clientes que no pueden ser atendidos por la CPA Serra Torres. Así, la cláusula de no competencia estaba dirigida a impedir exclusivamente que ésta le proveyese servicios a los clientes de la firma o corporación profesional de la cual fue parte por varios años. Incluso, la limitación acordada le permitía a la CPA Serra Torres continuar atendiendo a los clientes que ella sumó a la cartera de clientes de la firma.

Es menester destacar que, a cambio de esta limitación, la CPA Serra Torres pactó una contraprestación significativa. Según surge del expediente, aparte del precio estipulado para la venta de las acciones, ésta negoció los beneficios de un plan médico, el reembolso de varios pagos al seguro social y su liberación de las obligaciones de la Corporación que había garantizado. Además, la CPA Serra Torres consintió en toda su extensión a los claros términos del acuerdo, ello tras haber recibido asesoría legal.

Por otro lado, como expuse anteriormente, la elaboración de esta cláusula de no competencia respondió a un proceso de negociación entre partes igualmente situadas dentro de una compleja transacción comercial. Por tanto, contrario a la determinación de los foros recurridos, la restricción de la cláusula de no competencia no tenía que estar condicionada, so pena de nulidad, a un término

máximo de 1 año de duración. En vista de que una mayoría de los tribunales estatales americanos han avalado como razonables limitaciones temporales de entre 2 años a 5 años, entiendo que en el caso de autos el término de 16 meses es razonable y debe ser respetado según fue pactado.

Por todo lo anterior, concluyo que la cláusula de restricción que contrató la CPA Serra Torres de no atender por un término de 16 meses la clientela que Reyes Ramis CPA Group, P.S.C. posee y desarrolló por su cuenta, está razonablemente elaborada para atender las particularidades del negocio, los intereses de las partes y el interés público. Considerando el principio de la autonomía de la voluntad de las partes que establece el Art. 1207 del Código Civil, supra, entiendo que la cláusula de no competencia en el caso de autos es válida. Por lo tanto, estoy conforme con la determinación de este Tribunal.


                              Erick V. Kolthoff Caraballo
                                    Juez Asociado