ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XII

| | | |
|---|---|---|
| WINDMAR PV ENERGY, INC<br>Peticionario<br><br>v.<br><br>ION LEED LLC<br>Recurrido | TA2026CE00118<br><br><br>cons. con<br><br>TA2026CE00135 | *Certiorari*<br>procedentes del<br>Tribunal de Primera<br>Instancia, Sala<br>Superior de San Juan<br><br>Casos Núm.:<br>SJ2023CV08547 y<br>SJ2023CV09334<br><br>Revisión de Laudo<br>Caso: 01-22-0000-4886 |
| ION LEED LLC<br>Peticionario<br><br>v.<br><br>WINDMAR PV ENERGY, INC<br>Recurrido | | |

Panel integrado por su presidente, el Juez Candelaria Rosa, el Juez Adames Soto, el Juez Campos Pérez y la Jueza Trigo Ferraiuoli

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 15 de abril de 2026.

Comparecen las partes del epígrafe Windmar PW Energy, Inc. (Windmar) e Ion Leed, LLC (Ion Leed) con sendos autos discrecionales de *certiorari*. Ambas partes impugnan la *Sentencia* emitida y notificada el 11 de agosto de 2025 por el Tribunal de Primera Instancia, Sala de San Juan (TPI). En el referido dictamen, luego de consolidar dos peticiones de revisión de laudo, el TPI descartó la solicitud de revisión de Ion Leed y declaró con lugar uno de los señalamientos planteados por Windmar. En consecuencia, modificó la decisión arbitral y computó una cuantía adicional de $2,877,073.20 en daños a favor de Windmar que sumada a la ya adjudicada ascendió a un total de $3,642,089.94.

**I.**

El 31 de agosto de 2020 Ion Leed y Windmar suscribieron un acuerdo contractual por dos años (vigencia hasta el 30 de agosto de 2022), denominado *Sub-Channel Partner Agreement* (SCPA).[1] El pacto

---
[1] Apéndice TA2026CE00118, págs. 10-21.

autorizaba a Ion Leed a promover, vender, distribuir e instalar productos y servicios de Windmar, relacionados con energía renovable, los cuales serían financiados por Sunnova Energy y Oriental Bank. El SCPA incluía una cláusula sobre exclusividad y no competencia:

8. *Exclusivity or Non-Circumvention*

8.1 - During the term of this Agreement and for a period ending twelve (12) months thereafter, Sub-Channel Partner shall not, solely within the Territory, (a) hire or attempt to hire any employee or independent contractor of WINDMAR or anyone who was an employee or independent contractor of the WINDMAR within the six (6) months preceding such hire or attempt to hire; (b) assist in hiring or any attempt to hire anyone identified in clause (a); (c) encourage or solicit anyone identified in clause (a) to leave or diminish his or her relationship with WINDMAR for any reason; or (d) solicit or encourage any customer, consultant or supplier of, or other person doing business with, WINDMAR to terminate or diminish its relationship with WINDMAR or otherwise interfere with such business relationship.

8.2 - During the term of this Agreement, and for a period of twelve (12) months following its termination, **Sub-Channel Partner shall not sell, market, and/or provide products or services similar to Solar Products or Services <u>within the Territory</u> that involve solar-specific financing or leasing**, but excluding any credit union personal loans or loan-free sales. For the sake of clarity, **Sub-Channel Partner will not offer any products or services that use any national solar financing company that is not approved by WINDMAR**. (Énfasis nuestro).

Luego de varios desacuerdos, específicamente aquellos vinculados a la escasez de baterías de Windmar y fallas en el suplido, sin acudir antes a las cláusulas contractuales pactadas para dirimir esos asuntos,[2] Ion Leed rescindió por escrito el SCPA el 13 de diciembre de 2021.[3] En la misiva, Ion Leed comunicó su intención de acudir a arbitraje ante la Asociación Americana de Arbitraje (AAA), según pactado. La petición ante la AAA se concretó el 20 de enero de 2022.[4]

---

[2] Véase, cláusula 15 *Miscellaneous* del SCPA.
[3] Apéndice TA2026CE00135, págs. 113-114.
[4] Apéndice TA2026CE00135, págs. 22-24. Véase la alegación responsiva y reconvención de Windmar en el Apéndice TA2026CE00118, págs. 23-39; así como la contestación de Ion Leed a ésta en el Apéndice TA2026CE00135, págs. 42-62.

Transcurridos los procedimientos de rigor, el 11 de agosto de 2023, el Árbitro, Lcdo. Jaime E. Toro Monserrate, dictó conforme a derecho el *Laudo del Árbitro* (*Laudo*) sujeto a revisión.[5] En lo que atañe a los señalamientos de error señalados, el *Laudo* determinó, en esencia, lo siguiente:

(1) La cláusula 8, *Exclusivity or Non-Circumvention*, es exigible durante la vigencia del contrato, dado que se trataba de una relación exclusiva. Empero, es inválida una vez terminado el SCPA, por ser irrazonable debido a la amplitud extrema.

(2) Windmar no responde por los cambios de precios ni por la falta de suministros de baterías. En el primer caso, obedecieron a las fluctuaciones del mercado; en el segundo, a la escasez en general por lo que se prorrateó la distribución. Tampoco Ion Leed probó la responsabilidad de Windmar por los pagos fuera de término, ya que los mismos estaban sujetos a la aprobación de documentos de financiamiento de Sunnova y Oriental. Además, Ion Leed no demostró de manera clara cómo estas situaciones lo afectaron.

(3) El hecho que los conflictos no fueran dirimidos bajo los mecanismos de resolución pactados en el SCPA impidió inhabilitar la cláusula restrictiva acordada, así como el reclamo de daños por parte de Ion Leed.

(4) Los contratos generados por Ion Leed a beneficio de Sunrun —competidor directo de Sunnova en el mercado— mediante el *Power Purchase Agreement* constituyeron una pérdida para Windmar y una violación contractual.

(5) Ion Leed tiene a su favor un crédito de **$133,083.76**, sobre el que opera la figura de compensación en atención a la cuantía de los daños sufridos por Windmar.

(6) Ion Leed responde por daños a Windmar por la suma de **$765,004.00** (cifra redondeada).[6]

El monto impuesto surge de una aproximación razonable realizada por el Árbitro a base de la informacion suministrada por las partes y

---

[5] Apéndice TA2026CE00118, págs. 1-9.

[6] Además, las partes debieron satisfacer en partes iguales los honorarios y gastos del Árbitro por $28,152.50; así como $28,500.00 a favor de la AAA.

creída por el juzgador. <u>El cómputo incluyó (1) el número de contratos afectados y (2) el valor de éstos</u>. El cálculo consideró <u>270</u> contratos anuales aproximados (22.5 mensuales) multiplicados por el valor promedio estimado por contrato de <u>$26,610.00</u> cada uno, producto igual a $7,184,700.00. El término compensable dispuesto por el *Laudo* se extendía de abril de 2021 a 13 de diciembre de 2021. Se dividió la cifra anterior entre <u>8</u> meses para un subtotal de $898,087.50 que al restar el crédito de Ion Leed de $133,083.76 da un total de $765,003.74, redondeado a **$765,004.00**.

Es importante señalar que el término compensable fue un asunto dirimido previo a la emisión del *Laudo*, mediante las *Órdenes* 13 y 14 de 10 de abril de 2023 y 1 de mayo de 2023, respectivamente.[7] Esta adjudicación fue impugnada por Windmar en reconsideración, mientras que Ion leed se opuso.[8] El asunto en cuestión versaba sobre el descubrimiento de prueba (*Subpoena Duces Tecum*) a Sunrun, un tercero en el proceso arbitral, solicitado por Windmar para la reclamación de daños.[9] A esos propósitos, el interventor arbitral justipreció que el **plazo pertinente** para el descubrimiento de prueba de información no privilegiada era hasta el 13 de diciembre de 2022, "un año después de la **efectividad de la terminación del contrato**". (Énfasis nuestro).

Los pronunciamientos interlocutorios no atendieron la cuestión sobre la validez o no de la cláusula de no competencia. Por lo tanto, de resolver en la eventualidad a favor de ésta, los doce meses de prohibición se extenderían hasta el 13 de diciembre de 2022, "un año después de la **terminación efectiva** del *Sub-Channel Partner Agreement* entre Windmar y Ion Leed (el Contrato)". (Énfasis nuestro). *A contrario sensu*, de determinar la nulidad de la cláusula de no competencia por su extrema amplitud, como en efecto sucedió, el término compensable se

---

[7] Entrada 44 (Anejo) SJ2023CV08547 SUMAC y Apéndice TA2026CE00135, pág. 79.
[8] Véase, 63-64, 65-78.
[9] El acuerdo entre Ion Leed y Sunrun data de 30 de junio de 2021. Véase, Apéndice TA2026CE00118, págs. 53-165.

extendería hasta el 13 de diciembre de 2021, cuando en efecto "el contrato entre las partes concluyó".

No contestes con el *Laudo*, ambos litigantes acudieron al TPI. Ion Leed solicitó la impugnación del *Laudo* en su totalidad; y Windmar peticionó su modificación. Las partes plantearon las siguientes controversias:[10]

### SJ2023CV08547
### Ion Leed

*Erró la AAA a través del Hon. Árbitro, Jaime Toro, al emitir un Laudo Arbitral contrario a derecho, aplicando la cláusula de no-competencia ("exclusividad") de forma parcial y discriminada ("blue pencil approach"), modificando la intención contractual de las partes, a pesar de haber correctamente declarado nula dicha cláusula de no-competencia, e imponiendo a Ion Leed, LLC., el pago de $898,087.50 por concepto de compensación reclamada por Windmar, mediante reconvención.*

### SJ2023CV09334
### Windmar

*a) El Árbitro erró como cuestión de derecho al adjudicar los remedios en ley procedentes ante una adjudicación de que Ion Leed violó sus acuerdos con Windmar.*

*b) El Árbitro erró como cuestión de derecho al invalidar la cláusula de no competencia legítimamente pactada por las partes a tenor con el derecho vigente.*

*c) El Árbitro erró como cuestión de derecho al establecer el remedio procedente en ley ante el incumplimiento de un contrato y de una cláusula de no competencia.*

Luego de consolidar los litigios, el TPI celebró una vista argumentativa el 13 de enero de 2025.[11] Ponderadas las posturas de las partes, el 11 de agosto de 2025, notificó la *Sentencia* que nos ocupa.[12]

En su determinación judicial, el TPI declaró no ha lugar la petición de impugnación del *Laudo* instada por Ion Leed, toda vez que estimó que el Árbitro no incidió en la interpretación de la cláusula 8, *Exclusivity or Non-Circumven*, al no descartar el acuerdo de exclusividad. En cuanto a la solicitud de modificación del *Laudo* incoada por Windmar, el TPI

---

[10] Refiérase a las entradas 1 en los casos SJ2023CV08547 y SJ2023CV09334 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

[11] Entrada 46 SJ2023CV08547 SUMAC.

[12] Entrada 56 SJ2023CV08547 SUMAC.

declaró con lugar únicamente en lo que respecta al señalamiento *(a)* antes citado, sobre la adjudicación de remedios procedentes a la luz de la violación del SCPA por parte de Ion Leed. El TPI entendió que el Árbitro cometió un error de derecho al no considerar los daños ocasionados a Windmar durante el periodo comprendido desde 14 de diciembre de 2021, hasta el 30 de agosto de 2022, ya que "unilateralmente y contrario al propio contrato, Ion Leed canceló el contrato". A esos efectos, concedió una indemnización adicional, hasta alcanzar un monto total de $3,642,089.94.[13]

El TPI reconoció las dificultades que el Árbitro enfrentó al valorizar los daños. Adjudicó *sua sponte* como correctos los cálculos de Windmar sobre que Ion Leed generó 127.2 contratos mensuales en el periodo desde enero de 2022 a noviembre de 2022 (a base de 1,399 contratos entre 11 meses),[14] lo cual multiplicó por $26,610.00 o el valor promedio estimado por contrato, según resolvió el Árbitro, para un subtotal de $3,384.792. Esa suma la multiplicó por 8.5 meses correspondientes al periodo de 14 de diciembre de 2021 a 30 de agosto de 2022, con un subtotal de $28,770,732.00. Aplicó el 10%[15] para un resarcimiento de $2,877,073.20. A esta cuantía le sumó los $898,087.50 calculados en el *Laudo* y sustrajo el crédito de Ion Leed de $133,083.76 para un total de **$3,642,076.94**.

Windmar incoó una petición de reconsideración parcial;[16] mientras que Ion Leed impugnó la totalidad del dictamen,[17] con sendas oposiciones de los contendientes[18] y una réplica de Windmar.[19] El 30 de diciembre de 2025, con notificación de 7 de enero de 2026, el TPI declaró no ha lugar los pedimentos.

---

[13] Según los cómputos utilizados, la cantidad tiene un error de cálculo de $13.00.
[14] Véase, Apéndice TA2026CE00118, págs. 326-327, 328-337 y 338-339.
[15] Véase, cláusula 4.3 del SCPA.
[16] Entrada 62 SJ2023CV08547 SUMAC
[17] Entrada 67 SJ2023CV08547 SUMAC.
[18] Entradas 69 y 70 SJ2023CV08547 SUMAC.
[19] Entrada 73 SJ2023CV08547 SUMAC.

Inconformes, Windmar acudió ante nos el 30 de enero de 2026, mediante el recurso de *certorari* TA2026CE00118. Ion Leed, por su parte, presentó la petición de *certiorari* TA2026CE00135 el 5 de febrero de 2026. Mediante *Resolución*, ordenamos la consolidación de ambos autos. A continuación, reproducimos los errores señalados por las partes:

**TA2026CE00118**
**Windmar**

*Primer Error:* Erró el Árbitro y el TPI al determinar que la cláusula de no competencia es inválida luego de la terminación del *Sub-Channel Partner Agrreement.*

*Segundo Error:* Erró el Árbitro y el TPI al determinar que prohibirle a Ion Leed de ofrecer productos financiados por una compañía de financiamiento solar a nivel nacional limita excesivamente su capacidad de ofrecer servicios y productos en Puerto Rico.

*Tercer Error:* Erró el Árbitro y el TPI al determinar que la prohibición a Ion [L]eed de otorgar contratos por un año en todo Puerto Rico es excesivamente largo.

*Cuarto Error:* Erró el Árbitro y el TPI al determinar que la cláusula de no competencia s[ó]lo hace referencia al periodo de doce (12) meses, pero es silente en cuanto a los demás criterios, y por eso es inválida al terminar la relación contractual entre las partes.

**TA2026CE00135**
**Ion Leed**

*Primer error:* Erró el TPI al no determinar que los incumplimientos de Windmar con el *Sub-Channel Partner Agrreement* justifican la rescisión del acuerdo.

*Segundo error:* Erró el TPI al dictar sentencia al extender el periodo de tiempo para calcular los daños hasta el 30 de agosto de 2022, cuando la cláusula de exclusividad fue declarada inválida para dicho periodo.

*Tercer error:* Erró el TPI al convertir una "mejor aproximación" en *quantum* indemnizatorio cierto por 8.5 meses mediante promedios y prorrateos no probados en corte ni en el arbitraje.

*Cuarto error:* Erró el TPI al calcular sobre ingresos brutos sin deducir gastos operacionales: ausencia de prueba de "lucro neto" indemnizable.

*Quinto error:* Erró el TPI al no anular el laudo como consecuencia de la alteración del término considerado para la concesión de daños determinados por el [Á]rbitro, excediendo los límites del control judicial del laudo:

revaloración fáctica, ampliación temporal y suplencia de hechos no probados, abusando así de su sana discreción.

*Sexto error:* Erró el TPI al aplicar el "blue-pencil approach" a una cláusula irrazonable pese a la doctrina de *Martín's BBQ, Inc. v. García de Gracia,* [178 DPR 978 (2010)], que rechaza modificar la voluntad contractual.

Tanto Windmar como Ion Leed presentaron sus respectivos alegatos de oposición. Con la comparecencia de las partes, procedemos a resolver.

## II.

## A.

En nuestra jurisdicción se reconoce la vigorosa política pública a favor del arbitraje. *Aponte Valentín et al. v. Pfizer Pharm.,* 208 DPR 263, 282 (2021). Debido a que el arbitraje es una figura inherentemente contractual, el mecanismo se utiliza conforme se haya pactado entre las partes. *Id.*; *S.L.G. Méndez-Acevedo v. Nieves Rivera,* 179 DPR 359, 367-368 (2010); *Crufon Const. v. Aut. Edif. Púbs.,* 156 DPR 197, 205 (2002). La hoy derogada pero vigente a los hechos,[20] *Ley de Arbitraje Comercial en Puerto Rico,* 32 LPRA ant. sec. 3201 *et seq.,* disponía en su Artículo 1:

Dos o más partes podrán convenir por escrito en someter a arbitraje, de conformidad con las disposiciones de esta Ley, cualquier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha del convenio de someter a arbitraje; o podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en relación con el mismo. Tal convenio será válido, exigible, e irrevocable salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio.

Como se conoce, los procedimientos y los laudos de arbitraje gozan de una especial deferencia ante los foros judiciales. *UGT v. Centro Médico del Turabo,* 208 DPR 944, 955 (2022). Ante esa deferencia, el Artículo 22 de la anterior *Ley de Arbitraje Comercial* establecía los motivos por los cuales se puede impugnar exitosamente un laudo:

(a) Cuando se obtuvo mediante corrupción, fraude u otro medio indebido.

---

[20] El estatuto fue derogado por la Ley Núm. 147 de 9 de agosto de 2024, *Ley de Arbitraje de Puerto Rico,* 32 LPRA sec. 3230 *et seq.*

(b) Cuando hubo parcialidad o corrupción evidente de los árbitros o cualquiera de ellos.

(c) Cuando los árbitros actuaren erróneamente al rehusar posponer la vista luego de mostrarse causa justificada para ello, o al rehusar oír evidencia pertinente y material a la controversia, o cuando incurrieren en cualquier error que perjudique los derechos de cualquiera de las partes.

(d) Cuando los árbitros se extendieren en sus funciones o cuando el laudo emitido no resolviera en forma final y definitiva la controversia sometida.

(e) Si no hubo sumisión o convenio de arbitraje válido y el procedimiento se inició sin diligenciar la notificación de intención de arbitrar, [...]. 32 LPRA ant. sec. 3222. Véase, *UGT v. Centro Médico del Turabo, supra*, págs. 955-956; *Condado Plaza v. Asoc. Emp. Casinos P.R.*, 149 DPR 347, 353 (1999).

En otras palabras, si no está presente alguna de estas consideraciones, se impone la autolimitación judicial. Véase, *Aquino v. AEELA*, 182 DPR 1, 25 (2011); *C.F.S.E. v. Unión de Médicos,* 170 DPR 443, 449 (2007). Ahora bien, "si las partes acuerdan que el laudo sea emitido conforme a derecho, los tribunales de justicia pueden corregir errores jurídicos de forma cónsona con el derecho aplicable". *UGT v. Centro Médico del Turabo, supra*, pág. 956 y la jurisprudencia allí citada.

> [L]as determinaciones de hechos en laudos de arbitraje conforme a derecho pueden ser revisadas cuando no están sostenidas por evidencia sustancial en el expediente. Claro está, aun en estos casos, **los tribunales de instancia no deben inclinarse a decretar la nulidad del fallo a menos que efectivamente éste no haya resuelto la controversia conforme a derecho**. Una mera discrepancia de criterio no justifica la intervención judicial, pues ello derrotaría los propósitos fundamentales del arbitraje. (Citas omitidas y énfasis nuestro). *Constructora Estelar v. Aut. Edif. Pub.,* 183 DPR 1, 33-34 (2011).

Es decir, ausentes las seis causas indicadas antes, la doctrina de deferencia y autolimitación judicial ceden únicamente cuando el laudo tiene que emitirse conforme a derecho y, más allá de una discrepancia de criterio, no fue resuelto en observancia al ordenamiento legal aplicable o al pactado entre las partes. Se ha pautado que la revisión del laudo es análoga a las decisiones de las de decisiones administrativas *C.F.S.E. v. Unión de Médicos, supra*, pág. 449. Por tal razón, las determinaciones fácticas se revisan si no están basadas en la evidencia sustancial que obra en el expediente. *Constructora Estelar v. Aut. Edif. Púb., supra,* págs.

33-34. Sin embargo, incluso en estos casos, los tribunales revisores no deben inclinarse a decretar la nulidad del fallo, a menos que en efecto el árbitro no haya resuelto la controversia conforme a derecho. *Id.*, pág. 34.

Por otra parte, es sabido que el mecanismo para que el Tribunal de Apelaciones revise las sentencias finales dictadas por el Tribunal de Primera Instancia, referentes a revisiones de laudos de arbitraje, es el *certiorari*. Véase, Regla 32 (C) Reglamento del Tribunal de Apelaciones, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, págs. 49-50, 215 DPR __ (2025). Para ello, nos regimos por los criterios esbozados en la Regla 40 de nuestra reglamentación, sobre la expedición del auto. *Id.*, págs. 62-63. Es norma asentada que este tribunal intermedio no interviene con las determinaciones emitidas por el foro primario ni sustituye su criterio discrecional, "salvo que se pruebe que dicho foro actuó con prejuicio o parcialidad, incurrió en craso abuso con el ejercicio de la discreción, o que incurrió en **error manifiesto**". (Cursivas en el original y énfasis nuestro). *Citibank et al. v. ACBI et al.*, 200 DPR 724, 736 (2018) y la jurisprudencia allí citada.

**B.**

Es norma conocida que, bajo la teoría general de obligaciones y contratos,[21] las partes contratantes "pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, **siempre que no sean contrarios a las leyes, la moral, ni al orden público**". (Énfasis nuestro). *Rodríguez García v. UCA*, 200 DPR 929, 943 (2018); Art. 1207 del Cód. Civil de 1930, 31 LPRA ant. sec. 3372. Un contrato existe cuando una o varias partes prestan su consentimiento a obligarse a dar alguna cosa o prestar algún servicio. *Id.*, págs. 726-727; Art. 1206 del

---

[21] En consideración a que la obligación objeto de controversia se perfeccionó el 31 de agosto de 2020, bajo la vigencia del Código Civil de 1930, aplicaremos dicho cuerpo normativo y su jurisprudencia interpretativa al asunto planteado. Ello así, en armonía con el Artículo 1812 del Código Civil de Puerto Rico, *Actos y contratos celebrados bajo legislación anterior*, 31 LPRA sec. 11717, que dispone: "Los actos y contratos celebrados bajo el régimen de la legislación anterior y que son válidos con arreglo a ella, surten todos sus efectos según la misma, con las limitaciones establecidas en este Código".

Cód. Civil de 1930, 31 LPRA ant. sec. 3371. El pacto será validado si concurren tres elementos esenciales, a saber: consentimiento, objeto y causa. *Id.*, pág. 727 y la jurisprudencia allí citada; Art. 1213 del Cód. Civil de 1930, 31 LPRA ant. sec. 3391.

Como se sabe, las obligaciones nacen de la ley, los contratos, los cuasicontratos y los actos y omisiones en que intervengan la culpa o negligencia. *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 726 (2018); Art. 1042 del Cód. Civil de 1930, 31 LPRA ant. sec. 2992. "Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos". Art. 1044 del Cód. Civil de 1930, 31 LPRA ant. sec. 2994. Este principio de *pacta sunt servanda* impone a las partes contratantes la exigencia de cumplir con lo pactado pues supone la inalterabilidad de los acuerdos contenidos en el contrato. *Rodríguez García v. UCA, supra*, pág. 943.

Del mismo modo, es norma asentada en nuestro ordenamiento el deber de actuar de buena fe en las relaciones contractuales. *800 Ponce de León v. AIG*, 205 DPR 163, 183 (2020). Este principio obliga a los contratantes "no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". Art. 1210 del Cód. Civil de 1930, 33 LPRA ant. sec. 3375. Por virtud de esta disposición, nuestra jurisprudencia ha reconocido que, de acuerdo con la naturaleza de la relación jurídica entre las partes, **la buena fe crea deberes especiales de conducta, exigibles en cada contrato**. (Énfasis nuestro). *Arthur Young & Co. v. Vega III*, 136 DPR 157, 170 (1994). De manera que "todo contrato debe tener como pilar principal el principio de la buena fe". *Id.*

## C.

En el ordenamiento de Puerto Rico, los acuerdos de no competencia son válidos con base en el principio de libertad de la contratación. *Martín's BBQ v. García de Gracia*, 178 DPR 978, 989 (2010); *Arthur Young & Co. v. Vega III*, 136 DPR 157, 169-170 (1994). El

Código Civil de Puerto Rico regula, por ejemplo, este tipo de acuerdo en el *contrato de agencia*, en el que el agente se obliga a promover continuadamente el negocio del comitente a cambio de una remuneración. Art. 1421 del Cód. Civil, 31 LPRA sec. 10421. La disposición civil dispone que los contratantes pueden convenir cláusulas de no competencia hasta un máximo de un (1) año cuando "(a) se prevé la exclusividad del agente en el área de negocios del comitente; (b) aplican en un territorio o a grupos determinados de personas; y (c) su aplicación resulta razonable conforme a la totalidad de las circunstancias". Art. 1438 del Cód. Civil, 31 LPRA sec. 10457.

Si bien las normas de las cláusulas de no competencia en el ámbito laboral, entre patrono y empleado, son específicas y el incumplimiento de cualquiera de sus requisitos acarrea la nulidad del pacto,[22] en otros escenarios contractuales, como los comerciales entre empresarios, los requisitos de estos acuerdos son menos rigurosos. A esos efectos, el Tribunal Supremo ha examinado métodos de análisis como la *regla per se*, que condena la restricción comercial sin examinar el fin o analizar su efecto en el mercado y el perjuicio a la competencia. *Martin's BBQ v. García de Gracia, supra*, pág. 993 y nota al calce 12. Por igual ha acogido

---

[22] En *Arthur Young & Co. v. Vega III*, 136 DPR 157 (1994), el Tribunal Supremo de Puerto Rico se expresó en torno a las cláusulas de no competencia en el campo laboral. El alto foro determinó que las cláusulas de no competencia serían válidas siempre y cuando cumplan con ciertos criterios. En primer lugar, debe existir un interés legítimo del patrono, por lo que la cláusula de no competencia lo protege de un perjuicio sustancial. El alcance de la prohibición debe corresponder con el interés del patrono, en cuanto a objeto, término y lugar de restricción o clientes afectados. Así, pues, dicho interés debe estar relacionado con el puesto de trabajo del empleado, quien podría, en efecto, competir con el patrono. Por tanto, el contrato debe especificar los límites geográficos necesarios para evitar una competencia real o los clientes implicados, es decir, aquéllos que el empleado atendió, inmediatamente antes de la renuncia o por un periodo razonable previo a la dimisión y que todavía eran clientes del patrono. Además, el acuerdo debe constar por escrito y no exceder doce meses. Otro elemento esencial en este tipo de pacto es la contraprestación que el patrono está compelido a ofrecer a cambio de la anuencia del empleado a no competir. En el citado caso normativo, la máxima curia expresó que no se admitirá como causa del acuerdo de no competencia la mera permanencia en el empleo. Además, el alto foro rechazó la posibilidad de modificar la cláusula de no competencia para ajustarla a normas razonables. Por tal razón, en vez de modificar la voluntad de las partes para ajustarla a normas razonables, se declarará nulo todo pacto de no competir que no cumpla con las condiciones mencionadas.

especialmente la *regla de la razonabilidad*. Particularmente en cuanto a ésta última, acotó la máxima curia:

> ... requiere un análisis extenso y ponderado de todas las circunstancias del caso específico. Algunos elementos a considerar cuando se utiliza este método de análisis son, entre otros: **(a) estudiar los hechos particulares del negocio al que se le está aplicando la restricción, incluyendo una definición de los productos que compiten actualmente o podrían competir en el futuro; (b) la composición y comportamiento del mercado; (c) la condición del negocio o mercado antes y después de la restricción; (d) la naturaleza de la restricción; (e) el efecto real o probable de la restricción**. (Citas omitidas y énfasis nuestro). *Id.*, págs. 994-995.

Es decir, las cláusulas de no competencia deben ser razonables en cuanto a las restricciones temporales, territoriales y materiales. *Id.*, pág. 998.

Precisamente, en el caso *Martin's BBQ v. García de Gracia*, el Tribunal Supremo dirimió la validez de una cláusula de no competencia en un contrato de franquicia. En esencia, concluyó que, al no tratarse de una relación patrono-empleado, sino entre empresarios, los intereses que afectan la razonabilidad de este tipo de restricción son distintos. A esos efectos, para decretar la validez de una cláusula de no competencia, el Tribunal Supremo rehusó ajustarse íntegramente a los parámetros rígidos establecidos en *Arthur Young & Co. v. Vega III, supra*. Por ejemplo, en el referido caso, el alto foro validó el término de dos años para la duración de la cláusula de no competencia, así como la restricción de la venta de productos iguales o similares; aunque anuló la disposición contractual, a la luz del principio de reciprocidad y razonabilidad, por exceder las restricciones geográficas necesarias para proteger los intereses legítimos del dueño de la franquicia. Allí se trataba de una prohibición de operaciones en un radio de diez millas de cualquier restaurante de la franquicia.

Además, en una *Opinión de Conformidad* del Juez Asociado Hon. Kolthoff Caraballo en el caso *Reyes Ramis v. Serra Torres*, 195 DPR

828 (2016),[23] resuelto por *Sentencia*, se pautó que, en un contrato de compraventa de acciones de una corporación de servicios profesionales, la cláusula de no competencia tampoco tenía que ajustarse a los rigores de los criterios establecidos en *Arthur Young & Co. v. Vega III, supra.* Se acentuó la validez de las cláusulas de no competencia que establecen términos de restricción entre dos (2) a cinco (5) años, si son negociadas entre partes igualmente situadas. Se reiteró también la importancia de la razonabilidad de las restricciones en cuanto al tiempo, área geográfica y actividades, las cuales deben ser necesarias para proteger los intereses legítimos del adquirente de la participación o negocio en venta.

En el caso aludido, al palio del principio de la autonomía de la voluntad de las partes, el Tribunal Supremo refrendó la cláusula de no competencia exigible contra la CPA Liza Serra Torres, por parte de Reyes Ramis CPA Group, PSC. En particular, se validó el pacto porque se extendía por un periodo de 16 meses; porque la restricción impuesta se limitó el alcance de la actividad prohibida a cierta clientela, en referencia a los clientes servidos por la demandada, exceptuando aquéllos que la CPA Serra Torres trajo a la firma. Con relación a la penalidad por incumplimiento, se exigió a la demandada pagar una indemnización de tres veces la facturación promedio de dichos clientes conforme con los servicios prestados por la entidad durante los últimos tres años de servicios. Se justificó la penalidad debido a que la CPA Serra Torres pactó una contraprestación significativa.

---

[23] En este caso, la CPA Liza Serra Torres se convirtió en accionista de la firma Reyes Ramis CPA Group, PSC. Dos años más tarde, la Sra. Serra Torres vendió su participación al ente jurídico y suscribió un documento intitulado *Acuerdo Privado de Renuncia Voluntaria, Redención y Compraventa de Acciones Corporativas*, el cual contenía una cláusula de no competencia. El pacto prohibía que la CPA Serra Torres prestara servicios a clientes de Reyes Ramis por un periodo de 16 meses, con excepción de los clientes que la contadora llevó a la corporación. Reyes Ramis demandó a la CPA Serra Torres y alegó que ésta estaba ofreciendo servicios a seis clientes de la corporación. La CPA Serra Torres adujo que el acuerdo de no competencia era nulo porque excedía el término de un año. El Tribunal de Primera Instancia y el Tribunal de Apelaciones le dieron la razón. El Tribunal Supremo, por su parte, los revocó y validó la cláusula de no competencia.

De otro lado, regularmente, los contratantes incluyen *cláusulas penales* para reforzar el incumplimiento de los términos pactados. El Código Civil establece, en parte, que las cláusulas así convenidas pueden consistir en el pago de una suma cierta o en cualquier otra pena. Art. 1257 del Cód. Civil, 31 LPRA sec. 9832. Sin dejar de reconocer su obligatoriedad, de ordinario, el tribunal tiene facultad para sustituir o moderar las penas en casos de extrema desproporción económica entre la sanción y la prestación. *Id.* Además de las cláusulas penales, los contratantes pueden convenir otros acuerdos, relacionados con el cálculo anticipado del daño causado por el incumplimiento. En tal caso, el acreedor no está obligado a probar el daño ni el deudor puede eximirse al acreditar que el daño no se verificó o fue de menor cuantía. Ambos tipos de cláusulas, penales y las que calculan anticipadamente el daño, pueden convenirse conjuntamente, siempre que así conste de forma clara en el contrato. *Id.*

No obstante, valga aclarar que el Tribunal Supremo ha rechazado modificar la voluntad de las partes, según ha sido expresada en una cláusula de no competencia que no cumpla con todas las condiciones de razonabilidad. Por ende, **si se demuestra que el acuerdo adolece de razonabilidad, por ser contrario a la buena fe contractual y al orden público, la cláusula de no competencia se invalida**. *Martin's BBQ v. García de Gracia, supra*, pág. 1002.

Relacionado con lo anterior, la doctrina *blue-pencil approach* permite a los tribunales modificar los acuerdos de no competencia irrazonables para hacerlos razonables.[24] En estos casos, más allá de interpretar un contrato, el tribunal asume un rol de creador de contratos (*contract maker*), sustituyendo su criterio por el de las partes. Por ello, se ha dicho que este proceder implica un abandono de la función tradicional

---

[24] *Unjust and contrary: The unworkable blue pencil doctrine* se recopiló en https://www.americanbar.org/content/dam/aba/publications/aba_journal_of_labor_ employment_law/v38/no-1/jlel-v38-n1-pivateau-1.pdf el 13 de marzo de 2026; 38 ABA *Journal of Labor & Employment Law* 1 (2024).

judicial de salvaguardar las intenciones de las partes contratantes, así como de proteger los intereses de la sociedad. Huelga mencionar que, en lo que nos compete, ante la ausencia de legislación o jurisprudencia en contrario, el *stare decisis* pautado en *Martin's BBQ v. García de Gracia, supra,* el cual es incompatible con la doctrina *blue-pencil approach,* continúa siendo la norma establecida en nuestra jurisdicción.

**III.**

En el caso TA2026CE00118, Windmar plantea que el Árbitro y el TPI erraron al invalidar la cláusula de no competencia después de la terminación del SCPA, debido a la imposición excesiva sobre Ion Leed en el ofrecimiento de sus productos y servicios durante 12 meses, dentro del territorio, en alusión a todo Puerto Rico, excluyendo préstamos personales de cooperativas de crédito o ventas sin préstamo. A base de esto, solicita la concesión de un tercer remedio económico por el periodo de 31 de agosto de 2022 hasta el 30 de agosto de 2023, ascendente a $4,061,750.40 adicionales a las cifras concedidas.

En torno a la cláusula de no competencia, en el recurso TA2026CE00135, Ion Leed señala que el TPI incidió al aplicar el *blue-pencil approach* a una cláusula irrazonable y contraria a la doctrina establecida en *Martín's BBQ, Inc. v. García de Gracia, supra,* que rechaza modificar la voluntad contractual. Además, Ion Leed impugna también la alteración del término considerado para la concesión de daños y que no se determinara que los incumplimientos de Windmar justificaban la rescisión del SCPA. En otros señalamientos, Ion Leed cuestiona los daños otorgados luego de terminado el SCPA, toda vez que la cláusula de no competencia se invalidó. Refutó la manera de computarlos, a base de aproximaciones, promedios y prorrateos no probados en el procedimiento de arbitraje ni en el judicial y sin considerar la ausencia de evidencia de lucro neto.

Al igual que Windmar, discutiremos en conjunto los cuatro señalamientos de error planteados en el recurso TA2026CE00118.

En esencia, la cláusula de no competencia contractual establece que, durante el periodo de 12 meses siguientes a la terminación del SCPA, dentro del territorio o Puerto Rico, Ion Leed estaría impedido de vender, comercializar o proporcionar productos o servicios similares de energía solar, que impliquen financiamiento o arrendamiento, con exclusión de las ventas pagadas sin préstamos o financiadas por cooperativas de ahorro y crédito. Ciertamente, si bien el término de 12 meses pactado no impone una carga onerosa al competidor y protege un interés legítimo de Windmar, otros criterios resultan excesivos e irrazonables, de conformidad con la totalidad de las circunstancias. Nótese que la inversión de este tipo de sistema suele ser muy costoso para la economía doméstica de los clientes. El Árbitro, por ejemplo, fijó el valor de los contratos en cerca de 30 mil dólares. Por ello, es razonable deducir que, en el mercado, las compras pagadas en su totalidad sin préstamos no constituyen la norma; por el contrario, la financiación es prácticamente indispensable. Estimamos que la restricción de las fuentes de financiación impuestas por Windmar, aun cuando haya culminado la relación contractual entre las partes, es onerosa e intrusiva. Asimismo, los excesos de la disposición restrictiva se reflejan en mayor grado en lo relacionado a los productos y servicios vedados, así como en la extensión territorial. La aplicación es demasiado amplia y, por ende, irrazonable. Así, pues, en la medida en que la cláusula de no competencia incumplió con el examen de razonabilidad, al pretender intervenir con el libre comercio, mediante restricciones territoriales y materiales excesivas e injustificadas, refrendamos su invalidez. A esos efectos, es improcedente la reclamación dineraria de Windmar para el periodo solicitado. Los errores no fueron cometidos.

Con relación a la cláusula de no competencia, Ion Leed alegó en el sexto señalamiento de error del recurso TA2026CE00135 que los foros inferiores aplicaron el *blue pencil approach*. No nos persuade.

La cláusula 15.7[25] del SCPA establecía que, si alguna disposición contractual o parte de ella se anulaba, dicha invalidez no incidiría sobre el resto de los acuerdos, los cuales permanecerían siendo vinculantes. En este caso, descartada la cláusula de no competencia en su totalidad (*Non-Circumvention*), únicamente Ion Leed quedaba obligado a la cláusula de exclusividad (*Exclusivity*), obviamente durante la vida del SCPA. En ese sentido, Ion Leed responde por sus actuaciones al relacionarse comercialmente con Sunrun, competencia directa de Windmar, mientras continuaba vigente su relación de exclusividad con Windmar. Independientemente de la nulidad decretada de la cláusula 8 de no competencia del SCPA y que, contrario a lo argüido, los foros revisados no modificaron las intenciones de las partes contratantes, lo cierto es que Ion Leed transgredió los cimientos de la buena fe contractual en el cumplimiento de las obligaciones contractuales. Producto de dichas actuaciones, Windmar es acreedor de una indemnización dineraria.

Tampoco le asiste la razón a Ion Leed al esgrimir en el primer error que el SCPA debió rescindirse debido a los incumplimientos de Windmar. En la causa presente, tal como resolvió el Árbitro, Ion Leed tenía a su haber mecanismos internos de resolución de controversias al palio de la cláusula 15.8 del SCPA.[26] Sin embargo, no los utilizó. Ion Leed sólo

---

[25] Citamos del SCPA: "15.7 - If any provision of this Agreement, or any part of any provision, is held to be invalid or unenforceable, that provision is deemed to be amended to apply to the extent enforceable and the balance of the Agreement shall be valid and binding."

[26] Reproducimos la cláusula del SCPA: "15.8 - This Agreement shall be governed by the laws of the Commonwealth of Puerto Rico, without giving effect to any principles or rules of conflict of laws that applies the laws of another jurisdiction. Any dispute, controversy or claim between the Parties, whether related to this Agreement or otherwise, and any dispute or claim related to the relationship or duties contemplated hereunder, including the validity of this clause (a "Dispute") will be resolved as set forth in this paragraph. Each Party will give written notice to the other Party of any Dispute claimed by it. Promptly following delivery of such notice, a representative of each Party will meet and will be obligated to attempt in good faith to resolve the Dispute. If within thirty (30) days following the receipt of notice of a Dispute, the Dispute has not been resolved such Dispute will be referred to binding arbitration at the request of any Party upon written notice to the other. Such arbitration proceeding will be administered by the American Arbitration Association ("AAA") in accordance with the then current Commercial Arbitration Rules and will be held in San Juan, Puerto Rico. The arbitration will be governed by the United States Arbitration Act, 9 U.S.C. §§ 1-16 to the exclusion

invocó el remedio arbitral cuando canceló el SCPA el 13 de diciembre de 2021, aun cuando la disposición alude a cualquier controversia o reclamación entre las partes. El error no se cometió.

Ahora bien, en el segundo error del recurso de Ion Leed, el peticionario reclama que el TPI incidió al extender la indemnización a favor de Windmar hasta el 30 de agosto de 2022, fecha pautada para la culminación del SCPA. En los señalamientos de error tercero, cuarto y quinto, impugna, por igual, la revalorización del remedio dinerario, así como los cómputos realizados por el TPI. Tiene razón.

A pesar de que el TPI coincidió con la determinación arbitral de invalidar la cláusula de no competencia y correctamente declaró no ha lugar la impugnación del *Laudo* interpuesta por Ion Leed en el caso SJ2023CV08547, el TPI decidió en el caso SJ2023CV09334 que Ion Leed canceló el SCPA contrario a sus términos. Erró al así concluirlo.

Somos del criterio que el SCPA permitía a ambas partes culminar la relación contractual previo al término de su vigencia.

12. *Duration and Termination*

12.1 - The term of this Agreement shall begin as of the Effective Date (as defined herein) and shall remain in effect for two (2) years following the Effective Date and shall then automatically renew for subsequent one-year terms unless a Party gives a written notice of non-renewal to the other Party no less than thirty (30) days prior to the end of the then-current term. If a Party properly gives a notice of non-

---

of any provision of state law inconsistent therewith or which would produce a different result. One arbitrator will determine the Dispute of the Parties and render a final award in accordance with the substantive law of the Commonwealth of Puerto Rico. Strict confidentiality will govern the arbitration proceedings, including all information submitted to the arbitrators and the decision or award entered by the arbitrators. Any court in the Commonwealth of Puerto Rico may enter judgment upon the award rendered by the arbitrators. The terms hereof will not limit any obligation of a Party to defend, indemnify or hold harmless another Party against court proceedings or other losses. The procedures specified in this section will be the sole and exclusive procedures for the resolution of Disputes between the Parties arising out of or relating to this Agreement; provided, however, that a Party may request temporary remedies in a court of law, in the Commonwealth of Puerto Rico, to maintain the status quo or to protect goods or property until the arbitration has initiated and the selected arbitrator has had the opportunity to resolve the request for temporary relief. Each Party is required to continue to perform its obligations under this Agreement pending final resolution of any Dispute arising out of or relating to this Agreement, unless to do so would be impossible or impracticable under the circumstances. The Parties further agree that jurisdiction and venue for any disputes arising from or relating to this Agreement will lie exclusively with the appropriate court in Puerto Rico".

renewal, then the Agreement shall naturally conclude at the end of the then-current term. **Any notice of** non-renewal or **termination must be given in writing to the other Party in order to be valid**. (Énfasis nuestro).

No albergamos duda que la terminación del SCPA estaba contemplada como parte de sus términos, siempre y cuando, se remitiera por escrito. De hecho, la cláusula 12.2 del SCPA consigna las causas justas por las que Windmar podía terminar por escrito la relación contractual con Ion Leed. Empero, el acuerdo no impuso criterios específicos a Ion Leed para la terminación del acuerdo ni previó un monto en daños mediante cláusulas penales.

Decididamente, el Árbitro resolvió conforme a derecho desde sus *Órdenes* interlocutorias sobre que la terminación efectiva del SCPA fue el 13 de diciembre de 2021. En esa ocasión, por escrito, Ion Leed le comunicó a Windmar su deseo de "dar por culminada la relación contractual por completo". Añadió que, "desde esta fecha en adelante" dio por resueltas las cláusulas contractuales y solicitó el correspondiente procedimiento de arbitraje ante AAA, en observancia a la cláusula 15.8 del SCPA. En consecuencia, no procede la retribución económica a favor de Windmar luego de la terminación del SCPA constatada el 13 de diciembre de 2021. Ello así, porque cualquier compensación a partir de 14 de diciembre de 2021 en adelante equivaldría *de facto* a validar la cláusula de no competencia anulada. Al arribar a esta determinación, es innecesario discutir los errores concernientes a los cómputos realizados por el TPI para conceder erróneamente la indemnización adicional a favor de Windmar.

En suma, evaluadas las posturas de los contendientes, los documentos que conforman el expediente y el derecho aplicable, colegimos que procede expedir las peticiones de *certiorari* consolidadas del epígrafe. Confirmamos el dictamen sentenciador en el caso SJ2023CV08547 (Ion Leed), que declaró no ha lugar la impugnación del *Laudo*; y revocamos la decisión del caso SJ2023CV09334 (Windmar), a

los fines de suprimir la compensación adicional computada por el TPI. Restituimos los pronunciamientos del *Laudo del Árbitro*, incluyendo la concesión en daños a favor de Windmar por **$765,004.00**.

### IV.

Por los fundamentos expuestos, los cuales hacemos formar parte de este dictamen, expedimos las solicitudes de *certiorari* debidamente consolidadas. Revocamos, en parte, la *Sentencia* recurrida y restituimos el *Laudo del Árbitro* en todos sus extremos.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones